DCP:DG/NM
F. #2018R02161

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

LEE COHEN,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR AN ARREST WARRANT

(18 U.S.C. §§ 371, 1956(h))

Docket No. 22-MJ-266

EASTERN DISTRICT OF NEW YORK, SS:

MICHAEL PREIS, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

In or about and between July 2018 and June 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LEE COHEN, together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, which transactions involved property represented by a person at the direction of, and with the approval of, a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, specifically, fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the

proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

In or about and between June 2017 and February 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LEE COHEN, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in HD View 360, Inc. ("HDVW"), in connection with the purchase and sale of investments in HDVW, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.   In furtherance of the conspiracy and to effect its objects, the defendant LEE COHEN, together with others, committed and caused to be committed, within the Eastern District of New York and elsewhere, overt acts described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I have been a Special Agent with the FBI for approximately seven years, and have been assigned to squads that investigate financial crimes since approximately 2016.   During my tenure as a Special Agent, I have participated in numerous investigations into various types of financial crimes, including domestic and international wire and securities fraud and money laundering.   I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) review of consensual recordings, emails, text messages, and other documents. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.   Transcriptions of recorded conversations set forth below are set forth in draft form and are subject to further revision.

I.      The Defendant and Relevant Individuals and Entities

2.      The defendant LEE COHEN was a citizen of the United Kingdom.

3.      Cooperating Witness 1 ("CW-1"), an individual whose identity is known to your affiant, was a citizen and resident of the United States.[2]

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

[2]      CW-1 has pled guilty to securities fraud and conspiracy to commit securities fraud.   He is currently cooperating in hopes of receiving leniency at sentencing (and has not yet been sentenced).   CW-1 has provided reliable information in the course of this investigation. CW-1's information has been corroborated by other evidence obtained during the course of the investigation, including bank records, emails and consensual audio and video recordings he and others have made.

4.      Company 1, an entity whose identity is known to your affiant, was a company based in Florida and controlled by CW-1.

5.      HD View 360, Inc. ("HDVW") was a microcap or penny stock company that traded under the ticker symbol "HDVW" on the over-the-counter markets.[3]   HDVW purported to be a company that distributed and installed security surveillance systems.

II.     The Money Laundering Scheme

6.      In or about and between July 2018 and June 2019, the defendant LEE COHEN, together with others, conspired to launder funds that he believed to be the proceeds of securities fraud through bank accounts outside the United States.   COHEN and his co-conspirators laundered what they believed to be the proceeds of a fraud for an undercover law enforcement agent (the "Undercover Agent") posing as a stock promoter.   In addition, in furtherance of the scheme, COHEN and others organized a shell company in Singapore for the Undercover Agent and opened bank accounts in the shell company's name with the intention that the Undercover Agent would use those accounts to launder additional funds in the future.

7.      On or about July 27, 2018, the defendant LEE COHEN participated in a consensually recorded telephone call with CW-1 and the Undercover Agent.   As described further below (paragraphs 18-23), COHEN had previously conspired with CW-1 in a securities fraud scheme.   During the July 27, 2018 call, COHEN stated, in part, that he was involved in "moving money," that he charged "points" to do so, and that he would be willing to introduce the

---

[3]      "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization.   Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges.   Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

Undercover Agent to some of his associates.   Based on my familiarity with this investigation
and related investigations and my conversations with the Undercover Agent, I understand
"points" in this context to mean that COHEN kept a percentage of the money that he "moved"
for other people.

8.      On or about September 14, 2018, the Undercover Agent participated in a
consensually recorded telephone call with the defendant LEE COHEN and Co-Conspirator 1, an
individual whose identity is known to your affiant and who COHEN introduced to the
Undercover Agent.   During the call, the Undercover Agent stated, in sum and substance, that he
was a stock promoter in the United States involved in illegal stock manipulations schemes, that
he paid stockbrokers a percentage of his profits as kickbacks and that he wanted to send money
offshore and then back to the United States in order to pay his brokers and "break the trail."   Co-
Conspirator 1 stated, in sum and substance and in part, that he had previously laundered money.
Co-Conspirator 1 described methods for laundering the Undercover Agent's funds, including
through the formation of offshore companies and the withdrawal of cash from one account and
the subsequent deposit of the cash into a different account.   Co-Conspirator 1 explained that he
would "wash" the money so that it was "completely clean," and that he usually charged a 30 to
35 percent fee when he "wash[es]" money.

9.      On or about September 19, 2018, the Undercover Agent participated in a
consensually recorded telephone call with the defendant LEE COHEN and Co-Conspirator 1,
during which the three continued their prior conversation about laundering the proceeds from the
Undercover Agent's fraudulent stock transactions.   During the call, Co-Conspirator 1 explained,
in sum and substance and in part, that in order to launder the criminal proceeds, the Undercover
Agent would send money to a bank account in Singapore that Co-Conspirator 1 controlled and

that Co-Conspirator 1 and COHEN would return the money to the Undercover Agent's bank account in the United States, minus a fee, from an account in Dubai.   Co-Conspirator 1 further stated that he would send an email to COHEN with the information for the bank account in Singapore to which the Undercover Agent should send his funds.

10.     On or about September 24, 2018, the defendant LEE COHEN sent the Undercover Agent information for a bank account controlled by Co-Conspirator 1 in Singapore (the "Singapore Account").

11.     On or about September 28, 2018, the FBI wired $100,000 from a bank account located in the Eastern District of New York to the Singapore Account.   Approximately two weeks later, on or about October 9, 2018, Co-Conspirator 1 caused approximately $64,570 to be sent via wire transfer to a bank account controlled by the FBI from an account in Indonesia.   On or about October 9, 2018, the Undercover Agent also received an email from the defendant LEE COHEN, containing a message from Co-Conspirator 1 attaching paperwork associated with the October 9, 2018 transfer.

12.     On or about October 16, 2018, the FBI again wired $100,000 from a bank account located in the Eastern District of New York to the Singapore Account.   On or about October 25, 2018, Co-Conspirator 1 caused approximately $64,955 to be sent via wire transfer to a bank account controlled by the FBI from an account in Dubai.   On or about October 29, 2018, the Undercover Agent received an email from defendant LEE COHEN containing a message from Co-Conspirator 1 asking the Undercover Agent to confirm that the Undercover Agent had received the funds.

13.     In furtherance of the money laundering scheme, the defendant LEE COHEN and Co-Conspirator 1 established a shell company in Singapore for the Undercover Agent and

opened two bank accounts in the shell company's name at banks in Singapore.   The purpose of forming the Shell Company and the associated bank accounts for the Undercover Agent was to enable the Undercover Agent to launder additional funds on his own.

14.     On or about December 3, 2018, the defendant LEE COHEN sent an email to the Undercover Agent containing a message from Co-Conspirator 1 that discussed establishing a shell company in Singapore for the Undercover Agent in exchange for $40,000.   In the message, Co-Conspirator 1 advised, in sum and substance, that he would use individuals with European passports to set up the company and open the bank accounts because "the banking system in Asia and around the world are scrutinizing certain countries and passport holders to open accounts as of the money laundering laws."   Co-Conspirator 1 also advised, in sum and substance, that after he set up the accounts, he would hand over to the Undercover Agent "all the docs including all banking codes with internet banking and company formation," and wrote, "PS. If you need assistance on more transferring monies but has to be 500,000USD plus I can do it for 20%, completely washed back to you."

15.     On or about and between December 20, 2018 and February 5, 2019, the defendant LEE COHEN and Co-Conspirator 1 continued communicating with the Undercover Agent via email about establishing the company in Singapore, with COHEN acting as an intermediary between Co-Conspirator 1 and the Undercover Agent.

16.     On or about February 12, 2019, the Undercover Agent received an email from the defendant LEE COHEN, which contained a message from Co-Conspirator 1 indicating, in sum and substance, that Co-Conspirator 1 had "[i]ncorporated the company which you asked for" [the "Shell Company"], that he would next work on "opening the bank account," and that the

"extremely stringent" "compliance" in Singapore and Asia "wont [sic] be a problem" because Co-Conspirator 1 had "good contacts in the banking industry."

17.     On or about April 8, 2019, the Undercover Agent received an email from the defendant LEE COHEN containing a message from Co-Conspirator 1 stating, in sum and substance, that the bank account for the Shell Company had been opened in Singapore, providing the account numbers, and asking to speak with COHEN and the Undercover Agent. On or about April 17, 2019, COHEN and Co-Conspirator 1 spoke on a consensually recorded conference call with the Undercover Agent.   During the conversation, Co-Conspirator 1 said that he was with COHEN and then said, in sum and substance and in part, that he had been able to open two bank accounts in the name of the Shell Company at two different banks in Singapore and that the Undercover Agent would be able to launder $80,000 to $100,000 a month through the account without setting off any red flags.

III.    The Securities Fraud Scheme

18.     In or about and between June 2017 and February 2018, the defendant LEE COHEN, together with others, agreed to defraud investors and potential investors in HDVW by, among other things, manipulating the price and trading volume of HDVW shares.

19.     According to CW-1, the defendant LEE COHEN operated a call room located in the Philippines.   COHEN used the call room to make phone calls to individuals in the United States and to recommend that they purchase HDVW shares at particular prices.   At the same time, COHEN coordinated with CW-1, who executed trades by selling HDVW shares at the same prices that COHEN had recommended that investors pay to purchase the shares.

20.     As a result of the trades coordinated by the defendant LEE COHEN and CW-1, CW-1, who controlled the majority of HDVW's free-trading shares at the time, was able to

control the price of HDVW shares and sell them for a profit.   Blue sheet data (trading records that brokers produce to the Securities and Exchange Commission) shows that more than 1,000 investors, including investors located in the Eastern District of New York, purchased HDVW shares during the scheme.

21.     CW-1 wired a portion of the proceeds of the sale of HDVW shares to other co-conspirators, including the defendant LEE COHEN in the Philippines and another co-conspirator ("Co-Conspirator 2"), an individual whose identity is known to your affiant.   Financial records show numerous transfers between the co-conspirators during the scheme totaling hundreds of thousands of dollars, including transfers to COHEN.

22.     In a consensually recorded meeting between the defendant LEE COHEN and the Undercover Agent on March 5, 2019, COHEN described in detail his involvement in the HDVW securities fraud scheme with CW-1 and others.   For example, COHEN referred to working with CW-1, "HDV whatever," [i.e., HDVW]; the percentage of the profits he was supposed to receive; how he was supposed to be paid ("[CW-1] sent the money to [co-conspirators] and then they're meant to pay me.   That's how it works."); and COHEN's view that he did not receive the payments he was owed.

23.     During the same meeting, the defendant LEE COHEN also described how market manipulation schemes work: "I was trying to tell your friend [CW-1] . . .   that['s] the way that I want to work it, listen I know the score.   I know about everything, the whole shebang, the people that buy the shares and they're the guys that make the money, they get it for nothing. Next week the stock's up at eight dollars or seven dollars but what I was trying to do was build a business so that once you give me HDV whatever it's called, yeah, okay, we've gotta move onto

10

something else, right?"   COHEN stated that he "never had a license [to sell stocks] . . . I just sell it.   Boiler room sort of thing."

24.     Because public filing of this document could result in a risk of flight by the defendant, who has not yet been apprehended, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant LEE COHEN, be dealt with according to law.

_Michael Preis_

MICHAEL PREIS
Special Agent, Federal Bureau of Investigation

Sworn to before me via telephone this
9th day of March, 2022

_Taryn A. Merkl_

THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK